**WO**

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Agilysys, Inc., an Ohio corporation, | No. CV-04-2023-PHX-DGC |
| Plaintiff, | |
| v. | **ORDER** |
| Clark Vipond, an Arizona citizen; and NVision Networking, Inc., an Arizona corporation, | |
| Defendants. | |

Following the Court's grant of partial summary judgment and the settlement with Defendant Clark Vipond, Plaintiff Agilysys, Inc. maintains a claim against Defendant NVision Networking, Inc. ("NVision") for intentional interference with a business expectancy. This claim was tried to the Court on February 27-28 and March 1, 2007. The Court heard testimony from several witnesses, received exhibits in evidence, and heard oral argument from the parties. This order will set forth the Court's findings of fact and conclusions of law. For the reasons set forth below, the Court will enter judgment in favor of NVision.

**A.    Intentional Interference with Business Expectancy.**

The essential elements of this tort under Arizona law are (1) the existence of a valid business expectancy, (2) knowledge of the expectancy on the part of the interferor, (3) intentional and improper interference inducing or causing a termination of the expectancy, and (4) resultant damage to the party whose expectancy has been disrupted. *See Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bur. of Maricopa County, Inc.*, 637 P.2d 733, 740

(Ariz. 1981); *Wagonseller v. Scottsdale Mem'l Hosp., Inc.*, 710 P.2d 1025, 1041-43 (Ariz. 1985), *superceded in other respects by* A.R.S. § 23-1501; *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1023-24 (9th Cir. 2000); Restatement (Second) of Torts § 766B (1977).  The Court will make findings of fact with respect to each of these elements.  The Court will divide its findings with respect to the third element into two parts: (a) an intentional and improper interference with the business expectancy and (b) termination of the expectancy induced or caused by the interference.

**B.    Valid Business Expectancy.**

Based on the following facts, the Court finds that Agilysys had a valid business expectancy with the Maricopa County Community College District ("MCCCD").

1.    MCCCD was in the process of developing a large-scale project called the student information system (the "SIS project").

2.    MCCCD had been working with Agilysys for several years in development of the SIS project.

3.     At the time of the events in question, the SIS project had progressed to the point of critical benchmark testing.  If the benchmark testing was successful, the project would go forward.

4.    MCCCD had identified Agilysys as one of the partners in the SIS project and anticipated using Agilysys as the sole reseller for Hewlett-Packard ("HP") equipment necessary for the project.

5.    HP was confident that Agilysys would be the HP reseller for the SIS project.

6.    Clark Vipond, the Agilysys sales representative assigned to the SIS project, had projected that Agilysys would receive the HP reseller business from the SIS project.

**C.    NVision's Knowledge of the Expectancy.**

Based on the following facts, the Court finds that NVision knew about the expected business between MCCCD and Agilysys.

1. Benchmark testing began in late May of 2004. Before that time, Vipond approached NVision about his leaving Agilysys and entering into a sales relationship with NVision. Based on circumstantial evidence, the Court finds that Vipond told NVision about the business opportunity at MCCCD and the involvement of Agilysys in that opportunity.

2. Vipond invited one of NVision's principals, Dan Meyer, to participate in the benchmark testing for the SIS project. NVision incurred the expense of Meyer traveling to Houston to participate in the benchmark testing for five days. Meyer understood before and during the benchmark testing that Agilysys was the HP reseller who had been involved in the SIS project prior to the benchmark.

3. NVision and Meyer understood that Vipond had worked for Agilysys on the SIS project. They also understood that Vipond was employed by Agilysys during the benchmark testing.

**D.     NVision's Intentional and Improper Interference.**

Based on the following facts, the Court concludes that NVision intentionally and improperly sought to interfere in the business expectancy between MCCCD and Agilysys.

1. NVision knew that Vipond was employed by Agilysys in late May of 2004 and during the benchmark testing in May and June of 2004.

2. While Vipond was still employed at Agilysys, NVision provided Vipond with NVision's HP identification number so that Vipond could place orders on behalf of NVision; NVision provided additional business information to Vipond with the understanding that Vipond would use the information to solicit orders; NVision provided Vipond with an NVision email address accessible over the Internet; Vipond began using the NVision email address while still employed at Agilysys, a fact known to NVision; NVision corresponded by email with Vipond about his contacts with MCCCD.

3. While employed at Agilysys, Vipond placed quotes with MCCCD and other clients on behalf of NVision and procured orders from his customers on behalf of NVision.

1.     4.     By June 10, 2004, NVision and Vipond had agreed that Vipond would terminate his relationship with Agilysys and go to work for NVision, receiving a 75% commission on all HP sales Vipond secured for NVision.

5.     After this understanding had been reached, Vipond arranged for Dan Meyer of NVision to attend the benchmark testing on the MCCCD SIS project. Vipond did so without the knowledge of Agilysys.

6.     NVision incurred the expense of having Dan Meyer attend and participate in the MCCCD benchmark testing, knowing that Vipond was participating in the test on behalf of Agilysys, that Vipond was still employed by Agilysys, that Vipond owed a duty of loyalty to Agilysys, and that Vipond had agreed to leave Agilysys and join NVision.

7.     Meyer and NVision viewed Meyer's participation in the benchmark testing as a marketing opportunity for NVision with MCCCD, an opportunity arranged by Vipond while Vipond was an employee of Agilysys.

8.     These actions by NVision were intentional efforts to interfere with the business expectancy between Agilysys and MCCCD.

9.     These actions by NVision were also improper. While employed by Agilysys, Vipond owed Agilysys a duty of loyalty that included a duty not to compete with Agilysys as to matters within Vipond's employment. *See McAllister Co. v. Kastella*, 825 P.2d 980, 982-83 (Ariz. Ct. App. 1992); *Evans v. Valley Radiologist, Ltd.*, 619 P.2d 5, 9 (Ariz. 1980). An employee breaches this duty by improperly soliciting the business of his employer's customers prior to the termination of his employment. *McAllister*, 825 P.2d at 982-83. Vipond breached his duty of loyalty to Agilysys by soliciting business for NVision while employed by Agilysys, and NVision knowingly encouraged and participated in this breach of duty.

**E.**     **The Interference Did Not Induce or Cause Termination of the Expectancy.**

Based on the following facts, the Court finds that NVision's intentional and improper

conduct did not induce or cause MCCCD to give the SIS project business to NVision.[1]

1. The primary decision-maker for MCCCD on procurement of hardware for the SIS project was Ren Carlson, the technology buyer for MCCCD. Carlson made the decision to use NVision, rather than Agilysys, as the HP reseller for the SIS project.

2. Carlson based his decision on the fact that Vipond had left the employment of Agilysys and had gone to work for NVision. Carlson had worked with Vipond for several years on the SIS project, liked him, found him to be dependable, and knew that he had worked well with the MCCCD server group which would be primarily responsible for the SIS project.

3. When Vipond left Agilysys, Carlson concluded that it made good business sense to stay with Vipond – the sales representative who had significant knowledge of the SIS project and had been working successfully with MCCCD for several years.

4. Carlson sought the input of the server group on this decision.

5. Prior to making the decision, Carlson had a disagreement with Agilysys concerning the terms and conditions of MCCCD's purchases through Agilysys. Carlson was not happy with the way he was treated by Agilysys concerning this issue, and did not believe it had been properly resolved.

6. Carlson met with Jim VeNard – the sales representative Agilysys put forward to replace Clark Vipond – and was not impressed. Carlson was concerned about VeNard's lack of a strong background in public procurement and higher education. He also found VeNard to be abrasive.

---

[1] The Court previously concluded that the tort of intentional interference with a business expectancy requires proof of causation. Dkt. #192 at 4. The Court concluded that Agilysys has the burden of showing that NVision's wrongful conduct was a "substantial factor" in Agilysys' loss of the MCCCD SIS project business. *Id*. at 5. Agilysys asserts that it must satisfy the higher standard of "but for" causation. Dkt. #248. Whether the "substantial factor" or "but for" causation test is applied, the Court finds that Agilysys has failed to meet its burden of proof.

7. Although it appears from the evidence that Carlson made his decision to switch to NVision before he met VeNard, Carlson's reaction to VeNard reinforced his decision.

8. On August 9, 2004, Carlson informed HP of his decision to use NVision as the HP reseller on the SIS project.

9. Earl Monsour was the head of the MCCCD server group which would be working directly to implement the SIS project.

10. Monsour had worked with Vipond on the SIS project since October of 2003. Monsour had weekly contact with Vipond on the project.

11. Monsour learned that Vipond was leaving Agilysys a few days after Vipond gave his termination notice to Agilysys. Vipond did not ask Monsour to continue using Vipond as the sale representative or to transfer MCCCD's business to NVision. Vipond told Monsour that he would be hearing from Greg Fisher, Vipond's sales manager at Agilysys.

12. Monsour did not hear from Fisher. Eventually, Monsour called Fisher to ask which sales representative would replace Vipond. Fisher said he was seeking a replacement.

13. A week or two later, Fisher called back and said that Jim VeNard would be the new Agilysys sales representative. Monsour met with VeNard. He was not impressed. He found VeNard talked too much about himself and too little about MCCCD. He nonetheless suggested that his subordinates give VeNard a chance.

14. The server group did not find VeNard to be responsive to their needs. When contacted for placing orders, VeNard would not respond promptly. Monsour eventually contacted Fisher and told Fisher that the MCCCD people were not happy with VeNard. Fisher said he would find somebody else at Agilysys and get back to Monsour. Fisher never got back to Monsour.

15. During the period of his unhappiness with VeNard, Monsour started thinking about giving the business to Vipond at his new company. Monsour wanted the kind of service Vipond previously had provided. Monsour talked internally at MCCCD about switching from

Agilysys to NVision. He and others at MCCCD concluded that they would recommend such a change if they did not hear of another replacement sales representative from Fisher. When they did not hear from Fisher, they recommended that Carlson switch from Agilysys to NVision. This recommendation was made before the August 9, 2004 notice to HP of the switch to NVision.

16. When asked to summarize the factors that caused him to conclude that the business should be given to Vipond and his new employer, Monsour listed four: the service Vipond had provided to MCCCD in the past, the performance of Dan Meyer at the SIS project benchmark testing, the lack of attentiveness from Agilysys following Vipond's departure, and the fact that both Agilysys and NVision were approved to enter WSCA contracts. Given the totality of the testimony of Monsour and Carlson, and the primary role of Carlson as the decision maker, the Court does not find that Dan Meyer's performance at the benchmark testing was a substantial factor in MCCCD's decision to give the SIS project business to NVision. Carlson did not testify that Meyer's performance at the testing played any role in his decision. Rather, the Court finds that Carlson's decision was based on the relationship MCCCD had developed with Vipond, the level of Vipond's service to MCCCD, and the desire of the MCCCD personnel to continue the relationship in connection with the SIS project.

17. There was no non-compete provision in Vipond's contract with Agilysys. Vipond was free to leave Agilysys, go to work for a competitor, and attract Agilysys customers to the competitor on the basis of Vipond's relationship with them. That is what happened in this case.

18. The Court finds that the improper conduct of NVision – knowingly participating in Vipond's breach of his duty of loyalty to Agilysys – did not cause or induce MCCCD to transfer its business from Agilysys to NVision. The Court finds that MCCCD would have transferred the SIS project to NVision even if Clark Vipond and NVision had not engaged in the improper conduct established by the evidence.

19. The Court finds the testimony of Carlson and Monsour to be credible.

**F.    University Medical Center.**

1. Agilysys presented no evidence that Agilysys had a business expectancy with the University of Arizona Medical Center ("UMC"), that NVision improperly interfered with that expectancy, or that the improper interference caused UMC to transfer its business to NVision.

**G.    Conclusions.**

1. Agilysys has failed to satisfy its burden of proving that the improper conduct of NVision induced or caused MCCCD to transfer its SIS project business to NVision, and therefore has failed to prove the tort of intentional interference with a business expectancy with respect to MCCCD.

2. Agilysys has failed to satisfy its burden of proving that it had a business expectancy with UMC, that NVision improperly interfered with that expectancy, or that the improper interference caused UMC to transfer its business to NVision, and therefore has failed to prove the tort of intentional interference with a business expectancy with respect to UMC.

3. In light of these conclusions, the Court need not address damages or the allocation of fault under A.R.S. § 12-2506.

4. The Court will enter judgment in favor of NVision. In doing so, the Court does not approve of the intentional and improper conduct of Clark Vipond or NVision in this case. To prevail on its tort claim, however, Agilysys must also prove that the improper conduct caused Agilysys' loss. Dkt. #192 at 4. Agilysys has failed to do so with respect to MCCCD and has failed to prove additional elements of the tort with respect to UMC.

5. The Court will enter judgment in favor of NVision by a separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DATED this 7th day of March, 2007.

_____
David G. Campbell
United States District Judge